Carol **WOODSMALL** and **Hughie Bennett, Plaintiffs–Appellants,**

v.

**REGIONAL TRANSPORTATION DISTRICT, a subdivision of the State of Colorado, Defendant–Appellee.**

No. 89SA195.

Supreme Court of Colorado,
En Banc.

Oct. 15, 1990.

As Modified on Denial of Rehearing
Nov. 19, 1990.

Bucholtz, Bull & Ewing, P.C., Mary Ewing, Law Office of Brian J. Lampert, Brian J. Lampert, Denver, for plaintiffs-appellants.

Carol Gilman Ford, for defendant-appellee.

Justice QUINN delivered the Opinion of the Court.

The plaintiff-appellants, Carol Woodsmall and Hughie Bennett, appeal the district court's dismissal of their personal injury claims against the Regional Transportation District (RTD) due to their failure to comply with the notice provisions of section 24–10–109 of the Colorado Governmental Immunity Act, §§ 24–10–101 to 120, 10A C.R.S. (1988 & 1990 Supp.). In dismissing the case, the district court ruled when subsection (1) of section 24–10–109 was amended in 1986 to state that "compliance" with the notice provisions of the Governmental Immunity Act shall be a jurisdictional prerequisite to any action brought against a public entity, the General Assembly thereby intended to impose a more stringent requirement than the preexisting "substantial compliance" standard and that Woodsmall and Bennett failed to satisfy the more stringent standard. We reverse the judgment of dismissal and remand the case for further proceedings because, in our view, the district court imposed a more stringent standard than was legislatively intended by the 1986 amendment to section 24–10–109.

I.

The 1986 legislative amendment to section 24–10–109(1) is central to the resolution of this case. Prior to 1986, section 24–10–109(1), 10 C.R.S. (1982), stated:

Any person claiming to have suffered an injury by a public entity or by an employee thereof while in the course of such employment shall file a written notice as provided in this section within one hundred eighty days after the date of the discovery of the injury. *Substantial compliance* with the notice provisions of this section shall be a condition precedent to any action brought under the provisions of this article, and failure of *substantial compliance* shall be a complete defense to any such action.

(Emphasis added). In 1986, the General Assembly amended section 24–10–109 to read as follows:

Any person claiming to have suffered an injury by a public entity or by an employee thereof while in the course of such employment shall file a written notice as provided in this section within one hundred eighty days after the date of the discovery of the injury, *regardless of whether the person then knew all of the*

*elements of a claim or of a cause of action for such injury. Compliance* with the provisions of this section shall be a *jurisdictional prerequisite* to any action brought under the provisions of this article, and failure of *compliance* shall forever bar any such action.

(Emphasis added). Ch. 166, sec. 9, § 24–10–109(1), 1986 Colo.Sess.Laws 873, 877 (presently codified at § 24–10–109(1), 10A C.R.S. (1988)). Section 24–10–109(2), 10A C.R.S. (1988), which was part of the original Governmental Immunity Act and was not affected by the 1986 amendment, requires that the written notice to the public entity contain the following:

(a) The name and address of the claimant and the name and address of his attorney, if any;

(b) A concise statement of the factual basis of the claim, including the date, time, place, and circumstances of the act, omission, or event complained of;

(c) The name and address of any public employee involved, if known;

(d) A concise statement of the nature and the extent of the injury claimed to have been suffered;

(e) A statement of the amount of monetary damages that is being requested.

Subsection (3) of the statute states that if the claim is against a public entity other than the state, "the notice shall be filed with the governing body of the public entity or the attorney representing the public entity" and that "[s]uch notice shall be effective upon mailing by registered mail or upon personal service." § 24–10–109(3), 10A C.R.S. (1988).

On January 14, 1987, Bennett was driving a motor vehicle in which his wife, Woodsmall, and their two minor children were riding as passengers. While Bennett's vehicle was stopped for a red light, a RTD bus struck a van which, in turn, collided with the rear of Bennett's vehicle. After the accident Bennett took Woodsmall to a hospital, where she was diagnosed as suffering from a backsprain and then released without further treatment. Bennett reported the accident by telephone to RTD on the following day. A report of Bennett's telephone call was prepared by a RTD employee. The report included a description of the time, place, and circumstances of the collision, the name of the RTD bus driver, and the fact that Woodsmall went to the hospital after the collision. The claim was then assigned to a RTD claims adjuster, Armonde Hainesworth, for investigation.

Over the next several days Woodsmall developed persistent pain in the areas of her neck and shoulder and experienced left temporal lobe headaches. She was treated for these symptoms with medication, ultrasound, electric shock, and osteopathic manipulative therapy. When Woodsmall's symptoms progressively worsened, she was referred to several physicians, including a specialist in temporal mandibular joint (TMJ) syndrome.

On March 18, 1987, Hainesworth, the RTD claims adjuster, forwarded to the attorney for both Woodsmall and Bennett a medical release authorization for Woodsmall's signature. The attorney rejected the releases, but wrote to the adjuster on April 1, 1987, and offered to prepare appropriate authorization forms, and then stated in his letter:

We have, at this point in time, ordered copies of Ms. Woodsmall's medical records to date. Whatever information we receive regarding her medical condition will be provided to you. It appears at this point in time that Ms. Woodsmall's injuries are quite substantial. She is undergoing treatment with Dr. Bennett Mechanic, a neurologist in the Denver area, and he has referred her to a specialist in temporary mendibular [sic] joint syndrome. As soon as I get information regarding the extent of her injuries, it will certainly be provided to you. We would very much like to resolve this matter short of litigation. Once Ms. Woodsmall reaches maximum medical improvement, or we are able to determine the complete extent of her injuries, we will be able to discuss settlement with you.

On May 15, 1987, Woodsmall's and Bennett's attorney mailed a document to RTD

entitled "Notice of Claim Pursuant to C.R.S. 24-10-109," with a copy to RTD's legal counsel. The document stated:

TO: Regional Transportation District
1600 Blake Street
Denver, Colorado 80202-1300
Attention: Mr. Armonde Hainesworth
Re: Personal Injuries Sustained by Carol Woodsmall and Hughie Bennett, Claimants
9002 Osceola
Westminster, Colorado 80030

TO WHOM IT MAY CONCERN:

The above Claimants hereby provide notice in accordance with C.R.S. 24-10-109 of their claim arising out of a bus/automobile accident occurring on or about January 14, 1987, at the intersection of Larimer and 15th Streets, within the City and County of Denver, State of Colorado.

To the best of Claimants' knowledge and belief, they were rear-ended as a result of the negligence of an RTD bus. The Claimants were in a vehicle sitting still at a red light and the bus forced a van into the rear end of Claimants' vehicle.

The Claimants are seeking damages for physical injuries. Damages will be sought in an amount to be determined at a later date. Treatment is on-going and it is impossible at this point in time to determine an amount.

On September 2, 1987, Woodsmall's attorney forwarded medical reports and medical bills to the RTD claims adjuster, again repeating that treatment to Woodsmall was "on-going" and that a current prognosis was still unavailable. Approximately one month later Woodsmall's attorney sent to the claims adjuster an itemized statement of all medical bills incurred by Woodsmall and stated in the letter that he had requested Woodsmall's past dental records. These records were later for-warded to the claims adjuster in January 1988, along with a detailed letter describing the extent of Woodsmall's injuries. It was at this time, in January 1988, that the attorney notified the RTD claims adjuster of Bennett's claim for loss of consortium.

After settlement negotiations failed, Woodsmall and Bennett filed a complaint against RTD on April 19, 1988. Woodsmall claimed damages as a result of permanent injuries sustained in the accident, and Bennett's claim was limited to loss of consortium. RTD filed a motion to dismiss on the basis that the notice of claim sent to RTD on May 15, 1987, did not list the personal injuries sustained by Woodsmall, nor did it specifically describe Bennett's claim as one for loss of consortium, and thereby deprived the court of subject matter jurisdiction over the complaint. The district court granted the motion to dismiss, ruling that the 1986 amendment to section 24-10-109(1) was intended to create a more stringent standard of notice than previously existed and that the notice of claim sent to RTD did not comply with the applicable statutory standard.[1] Woodsmall and Bennett filed a motion to alter or amend the judgment, arguing that the court erred in imposing a standard of absolute or strict compliance and that such a construction violated due process of law and equal protection of the laws. The district court denied their motion, ruling in part that section 24-10-109(3) required that the notice of claim must be made by registered mail or personal service and that Woodsmall and Bennett failed to comply with the notice requirements of the Governmental Immunity Act.

Woodsmall and Bennett thereafter filed this appeal and claim that the district court erred in construing the 1986 version of section 24-10-109 as imposing a standard of absolute compliance with respect to notice and that such standard violates due process of law and equal protection of the

---

1. The district court also ruled that even if it "were to view all the written communications between the parties as amendments to the notice" of May 15, 1987, the information contained in those written communications would not satisfy the statutory requirement that the govern-ment entity be informed of the nature and extent of the injuries within 180 days after the date of the discovery of the injury. In light of our disposition of this case, we need not address this aspect of the district court's ruling.

laws. We agree with Woodsmall's and Bennett's claim that the district court erred in construing section 24–10–109 to mandate absolute or strict compliance with the notice requirements. Our resolution of the appeal on that basis renders it unnecessary to address Woodsmall's and Bennett's constitutional claims.[2]

## II.

### A.

 Basic rules of statutory construction must guide our analysis of the nature and effect of the 1986 legislative amendment to section 24–10–109(1). A court's primary task in statutory construction is to ascertain and give effect to the legislative purpose underlying a statutory enactment. *E.g., Colorado Common Cause v. Meyer*, 758 P.2d 153, 160 (Colo.1988); *Kern v. Gebhardt*, 746 P.2d 1340, 1344 (Colo.1987). In ascertaining the legislative purpose, we look first to the statutory language employed by the General Assembly and give words their commonly accepted and understood meaning. *E.g., Griffin v. S.W. Devanney and Co., Inc.*, 775 P.2d 555, 559 (Colo.1989); *People v. Guenther*, 740 P.2d 971, 975 (Colo.1987). When the statutory language is clear and unambiguous, there is no need to resort to interpretative rules of statutory construction, since in that instance it reasonably may be presumed that the General Assembly meant what it clearly said. *Griffin*, 775 P.2d at 559; *State Board of Equalization v. American Airlines, Inc.*, 773 P.2d 1033, 1040 (Colo.1989). "If, however, statutory language is uncertain as to its intended scope, with the result that the statutory text lends itself to alternative constructions, then a court may appropriately look to pertinent legislative history," *Griffin*, 775 P.2d at 559, as well as "[t]he circumstances under which the statute was enacted," § 2–4–203(1)(b), 1B C.R.S. (1980), in determining which alternative construction is more in accordance with the legislative purpose. When faced with a statutory ambiguity, a court also

may consider "[t]he consequences of a particular construction." § 2–4–203(1)(e), 1B C.R.S. (1980). Finally, while we must presume that a public interest is favored over any private interest, § 2–4–201(1)(e), 1B C.R.S. (1980), we also must be aware that the legislature intends "[a] just and reasonable result," § 2–4–201(1)(c), 1B C.R.S. (1980), and must accordingly consider both presumptions in a manner consistent with the discernible legislative objective.

### B.

 "Compliance" involves the act of conforming to formal or official requirements or norms, *Webster's Third New International Dictionary* 465 (3rd ed. 1961); *see also Black's Law Dictionary* (5th ed. 1979), and without further modification, connotes an element of degree. Compliance, for example, may be absolute or strict, on the one hand, or somewhat less than absolute but nonetheless substantial, on the other. In determining whether a particular statutory requirement has been satisfied, we have imposed a degree of compliance consistent with the objective sought to be achieved by the legislation under consideration. *Compare Charnes v. Norwest Leasing, Inc.*, 787 P.2d 145 (Colo. 1990) ("strict" compliance necessary to satisfy statutory recording requirement creating statutory exemption for tax lien on leased equipment) *with People v. Campbell*, 742 P.2d 302 (Colo.1987) ("substantial" compliance adequate to satisfy notice requirement of Uniform Mandatory Disposition of Detainers Act, and prisoner's act of making request to court for disposition of untried charges, rather than to district attorney as required by statute, constituted substantial compliance) *and Powers v. City of Boulder*, 54 Colo. 558, 131 P. 395 (1913) (substantial compliance adequate to satisfy notice-of-claim statute, and service of written notice of accident upon mayor, rather than upon city clerk as required by statute, substantially complied with purpose of statute).

---

**2.** Because of Woodsmall's and Bennett's constitutional claims, we accepted jurisdiction over

this appeal. § 13–4–102(1)(b), 6A C.R.S. (1987).

The notice requirements of section 24–10–109 are designed to permit a public entity to conduct a prompt investigation of the claim and thereby remedy a dangerous condition, to make adequate fiscal arrangements to meet any potential liability, and to prepare a defense to the claim. *E.g., Uberoi v. University of Colorado,* 713 P.2d 894, 899 (Colo.1986); *Fritz v. Regents of University of Colorado,* 196 Colo. 335, 338–39, 586 P.2d 23, 25 (1978). Given the fact that the degree of compliance necessary to conform to a statutory requirement may well depend upon the objective sought to be achieved by the specific legislation under consideration, we cannot say that the term "compliance" in the 1986 version of section 24–10–109(1) is so clear and unambiguous as to lend itself to one construction only. Under these circumstances we appropriately may resort to available legislative history and interpretative rules of statutory construction in arriving at a meaning consistent with the purpose of the 1986 amendment to section 24–10–109(1).

The statements made during the legislative committee hearing on the 1986 amendment to section 24–10–109(1) provide us with considerable insight into the circumstances underlying the amendment and the objective sought to be achieved by the amendment. When the bill was before the House State Affairs Committee, Representative Skaggs moved to reinstate the word "substantial" into the bill. In response to this motion, Representative Berry, who sponsored the bill, stated that the word "substantial" had been deleted in the bill because "certain cases had interpreted the word too loosely, so as to allow suit to be brought where the notice should have been fatally defective." When Representative Skaggs voiced a concern that the deletion of the word "substantial" would indicate an intent to require "absolute" compliance, a representative of the Municipal League stated to the committee that such deletion would "still leave room for the court to determine whether substantial compliance had occurred ... [and] would prevent the court from seizing on the word 'substantial' to allow all manner of defective notice to be considered." Representative Berry

agreed with this observation and stated, "We do leave the court some discretion by using the word 'compliance' and letting the court decide what that means, and, on the other hand, taking out the word 'substantial' removes what, at least, in a couple of cases, apparently has been a loophole...." Tape Recording of House State Affairs Committee Hearing on House Bill 1196, 55th General Assembly, Second Session, February 6, 1986. This legislative colloquy clearly indicates that the sponsor of the 1986 amendment did not intend to create a standard of absolute or literal compliance with the notice requirement, but rather intended a degree of compliance that was considerably more than minimal but less than absolute. The only fair characterization of such a degree of compliance is "substantial compliance."

We must be mindful of the consequences of a construction that would impose a standard of absolute compliance on a claimant who has been injured by a public entity. A rule of absolute compliance would require the dismissal of a claim when a claimant, within 180 days after the discovery of an injury, makes a good faith effort to satisfy the notice requirements but inadvertently omits a minor detail, or makes an error with respect to such detail, notwithstanding the fact that the omission or error cannot prejudice the public entity in the least. So also, a rule of absolute compliance would mandate the dismissal of a claim when the claimant serves the public entity with a timely written notice of the claim but is unable to specify the exact nature of the injury and the monetary value of the claim because of events beyond the claimant's control, such as, for example, the tentative nature of the claimant's medical condition and the unavailability of a definitive diagnosis of the claimant's injury. Nothing in the legislative comments on the 1986 amendment suggests that the General Assembly intended such a formalistic construction of the notice requirement.

To be sure, the notice requirements of section 24–10–109 serve to enhance a public entity's ability to remedy a dangerous condition and to plan for and defend against

any potential liability on a claim. *E.g.,* *Uberoi,* 713 P.2d at 899; *Fritz,* 196 Colo. at 338–39, 586 P.2d at 25. These interests, however, are not the only public interests implicated by the notice requirements. We believe that permitting injured claimants to seek redress for injuries caused by a public entity also serves a public interest. These multiple public interests, in our view, would not be served by engrafting a standard of strict compliance on section 24–10–109(1), nor would such a construction achieve a just and reasonable result.[3] On the contrary, we believe that these interests can best be accommodated by interpreting the term "compliance" in the 1986 version of section 24–10–109(1) as requiring nothing less than, nor more than, "substantial compliance."

Substantial compliance requires a claimant, within 180 days of the discovery of an injury, to file written notice with the public entity and to make a good faith effort to include within the notice, to the extent the claimant is reasonably able to do so, each item of information listed in section 24–10–109(2). In determining whether a claimant has substantially complied with the notice requirement, a court may consider whether and to what extent the public entity has been adversely affected in its ability to defend against the claim by reason of any omission or error in the notice.

### III.

■ In the instant case, the district court expressly rejected a standard of substantial compliance in resolving RTD's motion to dismiss and, instead, applied a standard of strict compliance. In so ruling, the district court erred. We believe it appropriate under these circumstances to remand the case to the district court to reconsider the motion under the standard of substantial compliance herein adopted.

Because RTD filed the motion to dismiss, it must bear the burden, on remand of this

case, of establishing by a preponderance of evidence that Woodsmall and Bennett failed to substantially comply with the notice requirements of section 24–10–109. As previously noted, the court may consider whether and to what extent any omission or error in the notice adversely affected RTD in its defense of the claim. If, on rehearing the motion to dismiss, the district court is satisfied that RTD has carried its burden, it should grant the motion to dismiss. Otherwise, the motion should be denied. The district court, in its discretion, may permit the parties to offer new affidavits or evidence in support of their respective positions.

■ We also note that the district court, in denying Woodsmall's and Bennett's motion to alter or amend the judgment, ruled that section 24–10–109(3) required that the notice of claim be served on the public entity by means of registered mail or personal service. The district court misapprehended the meaning of this statutory provision. Subsection (3) of section 24–10–109 does not state that service by registered mail or personal service is mandatory but only that the notice of claim "shall be effective upon mailing by registered mail or upon personal service." Subsection (3) is intended as a method of conclusively establishing that the effective date of service, for purposes of the 180-day requirement, is the date of the registered mailing. *Blue v. Boss,* 781 P.2d 128 (Colo.App.1989). Although resort to service by regular mail does not carry with it the presumption that service has been effected on the date of mailing, nothing in subsection (3) prohibits a claimant from utilizing this method or other methods of service in filing a claim with the public entity.

The judgment is reversed, and the case is remanded to the district court for further proceedings consistent with the views herein expressed.

---

**3.** Were we to adopt a rule of absolute compliance with respect to the notice concerning the amount of monetary damages, we would be inviting claimants to inflate the monetary value of their claims to the maximum amount that might be recoverable under the most favorable circumstances in order to avoid a judgment of dismissal. Such inflated notices hardly serve the purpose of permitting the public entity to engage in realistic fiscal planning with respect to any potential liability on a claim.

KIRSHBAUM, J., specially concurs.

ROVIRA, C.J., dissents.

VOLLACK, J., does not participate.

Justice KIRSHBAUM specially concurring.

I believe that under the circumstances of this case plaintiff-appellant Woodsmall's notice of claim to defendant Regional Transportation District (RTD) satisfied the applicable provisions of section 24–10–109(1), 10A C.R.S. (1988). The notice informed RTD of all of the information required by section 24–10–109(2), 10A C.R.S. (1988), to the extent the information was known to Woodsmall prior to the expiration of the requisite time period. Section 109(2)(e) requires "[a] statement of the amount of monetary damages that *is* being requested" (emphasis added). Woodsmall's statement that she was unable to ascertain the precise amount of damages that would later be requested, together with appropriate explanations for such inability, in effect states that she was not requesting a specific amount of damages at that time.

Under this circumstance, Woodsmall complied with the plain language of the statute while preserving her right to request an appropriate damage amount at some future date. This view of the statutory requirement encourages early notification to a defendant that a claim is being asserted rather than in some circumstances requiring delayed notification because of the plaintiff's inability to specify the precise amount of damages that "is" being asserted at the time the notice is filed.

For the foregoing reasons, I agree that the trial court erred in dismissing Woodsmall's claim.

**Chief Justice ROVIRA dissenting:**

I respectfully dissent. I accept the statement of the facts set out in the majority opinion and, accordingly, find no need to restate them. I disagree however with its underlying theme that "absolute compliance" and "strict compliance" are synonymous and the trial court erred in applying a standard more stringent than "substantial compliance."

The Colorado Governmental Immunity Act (Act), §§ 24–10–101 to –120, 10A C.R.S. (1988 & 1990 Supp.), was enacted to provide a balance between providing a remedy to persons injured by the state and its political subdivisions, and protecting those entities against the fiscal burden of unlimited liability. § 24–10–102, 10A C.R.S. (1988). In order to protect public entities from unanticipated exposure to liability, the Act has always required that a person injured by a public entity provide notice to that entity within a certain period after the injury was discovered. § 24–10–109, 10A C.R.S. (1988). In 1986, the General Assembly substantially amended the Act to provide more protection to public entities. The Act's notice provision was also amended to make its requirements more stringent. Prior to this amendment, subsection 24–10–109(1) provided:

> Any person claiming to have suffered an injury ... shall file a written notice as provided in this section within one hundred eighty days after the date of the discovery of the injury. *Substantial compliance* with the notice provisions of this section shall be a *condition precedent* to any action brought under the provisions of this article, and failure of *substantial compliance* shall be a *complete defense* to any such action.

(Emphasis added.)

As a result of the 1986 amendments, subsection 24–10–109(1), 10A C.R.S. (1988), now provides:

> (1) Any person claiming to have suffered an injury by a public entity or by an employee thereof ... shall file a written notice as provided in this section within one hundred eighty days after the date of the discovery of the injury, regardless of whether the person then knew all of the elements of a claim or of a cause of action for such injury. *Compliance* with the provisions of this section shall be a *jurisdictional prerequisite* to any action brought under the provisions of this article, and failure of *compliance* shall *forever bar* any such action.

(Emphasis added.)

In granting RTD's motion to dismiss, the trial court considered the language of the

Act both before and after the 1986 amendments and stated:

> Plaintiff's notice merely states that claimants are seeking compensation for "physical injuries" and that the amount of damages will be determined at a later date. Perhaps this notice letter would have been sufficient under the old C.G.I.A. where the standard was "substantial compliance" with the notice provision. However, with the 1987 [sic] amendments, the legislature was obviously making the standard a more stringent one. Under the current Act, compliance is a jurisdictional prerequisite. In light of this language, it does seem that this Court is deprived of subject matter jurisdiction to resolve the dispute between these parties. The effect of a nonclaim statute is to bar substantive claims. *Barnhill v. Public Service Company* [649 P.2d 716 (Colo.App.1982)] *supra.*

Contrary to the view expressed in the majority opinion, *see* at 68, I believe that the legislative colloquy set out in the majority opinion supports the reasoning of the trial court that, by deleting the term "substantial" and by making the notice provision a jurisdictional prerequisite, the legislature intended to impose a more stringent standard of compliance than was previously required. In short, I believe that compliance with the notice provision is properly tested by a standard greater than "substantial compliance." To hold otherwise is to suggest that the legislature was engaging in an exercise in futility. It is clear that the intent of the sponsor of the 1986 amendment in deleting the word "substantial" was because "certain cases had interpreted the word too loosely, so as to allow suit to be brought where the notice should have been fatally defective." At 68.

Moreover, notwithstanding the legislature's decision in 1986 to delete "substantial" from the phrase "substantial compliance," the majority nonetheless concludes that consideration of "multiple public interests" requires "nothing less than, nor more than, 'substantial compliance.'" At 69. I cannot agree that, in the face of the legislature's deletion of "substantial," subsection 24–10–109(1) may still be construed to require no more than "substantial compliance." *See, e.g., Charnes v. Norwest Leasing,* 787 P.2d 145, 148 (Colo.1990) ("There is a presumption that when a statute is amended there is an intent to change the law.") (quoting *People v. Hale,* 654 P.2d 849, 851 (Colo.1982)); *LaDuke v. CF & I Steel Corp.,* 785 P.2d 605, 610 (Colo.1990) (same); *Allee v. Contractors, Inc.,* 783 P.2d 273, 281 (Colo.1989) (where statutory scheme creating substantial rights is amended in significant particulars and partially repealed, conclusion is "inescapable" that legislature intended to change pre-existing state of the law).

The majority misreads the legislative history and concludes that by deleting the word "substantial" the sponsor really intended that the degree of compliance should be "substantial." At 68.

In my view, if the legislature had been satisfied with a standard of substantial compliance it would not have deleted "substantial" and would not have made compliance with the notice provisions a jurisdictional prerequisite and failure of compliance a bar to any action.

Accordingly, I respectfully dissent.